**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.                                                  Criminal Action No. 1:23-cr-00229 (CJN)

TAYLOR TARANTO,

*Defendant.*

**<u>MEMORANDUM OPINION</u>**

Defendant Taylor Taranto faces ten criminal charges—five arising out of his alleged

conduct at the U.S. Capitol on January 6, 2021, and another five (including four firearms offenses)

arising out of an incident in Washington, D.C. almost 30 months later.  He moves to suppress

certain evidence relating to the firearm offenses.  Following briefing and an evidentiary hearing,

the Court denies his motion.

## I.        Factual Background

Taranto is a Navy veteran who lives in Washington State.  *See* ECF No. 19 at 12.[1]  The

government alleges that he traveled to Washington, D.C. and breached the Capitol on January 6,

2021.  *See* ECF No. 26 at 1.  He was later charged with various offenses for his alleged conduct

that day.

The events most relevant to this opinion occurred in June 2023, but again in the

Washington, D.C. area.  In particular, on Wednesday, June 28, 2023, Taranto began livestreaming

himself on YouTube while waiting in the parking lot of a car repair shop in Gaithersburg,

---

[1] The following facts are drawn from the evidence admitted during the October 24, 2023
evidentiary hearing and other exhibits submitted by both the government and Defendant.

Maryland.  *See generally* "Copy of Livestream from June 28, 2023," Gov't Ex. 2.  Over the course of 90 minutes, Taranto made a series of disturbing comments suggesting that he had outfitted his vehicle with an explosive device.  Early in the livestream, for example, he stated that "no one knows where we're headed off to."  *Id*. at 3:35.  In speaking of his vehicle, he remarked that, "It does not have to be an inspection, this is its final days.  It's going one-way after this mission.  This thing is only going one way, to hell."  *Id*. at 4:05.  He stated that "custom firmware" had been added to the vehicle and ominously remarked that, "We do not need to be anywhere near it when it goes off."  *Id*. at 4:30.  And perhaps most ominously, he stated that he had "*been working on the detonator, but [didn't] really need one for this*."  *Id*. at 42:14–24 (emphasis added).

That same day, the U.S. Capitol Police obtained a video copy of the livestream, which they then shared with the FBI and other law enforcement agencies.  *See* Suppression Hearing, ECF No. 36 at 18:21–19:1.  Also that day, the Capitol Police issued a "Be-On-the-Lookout" alert to the D.C. Metropolitan Police Department and various federal law enforcement agencies regarding Taranto's van and his comments about a "detonator."  *See* Gov't Ex. 1.  The BOLO alert described Taranto and noted that he may be "Armed and Dangerous" based on his "Statement of Detonator."  Gov't Ex. 1.  It added that Taranto had made "concerning comments" referencing government officials and had told a "follower of the live stream that they will never see him again."  *Id*.

The next day, a magistrate judge of this Court issued an arrest warrant for Taranto arising out of his conduct at the U.S. Capitol Grounds on January 6, 2021.  Also the next day, Taranto drove his van to the Kalorama neighborhood of Washington, D.C. where a "number of embassy employees from other countries and higher profile individuals" live.  ECF No. 36 at 12:1–3.  The neighborhood is heavily protected by the U.S. Secret Service and police who are "responsible for

protecting embassy employees from foreign countries," *id*. at 33:19–24, as well as senior U.S. government officials.

Taranto parked his van on the street and again began livestreaming on YouTube as he walked through the neighborhood. He made several comments in the video about getting a "shot" and an "angle." *See, e.g.*, Gov't Ex. 3 at 12:00–20. He stated at one point, "I control the block, we've got 'em surrounded." *Id*. at 6:20–30. He stated that "these guys also all hang for treason" before emphasizing that "[y]ou gotta be very safe and careful." *Id*. at 9:25–35. At several points, Taranto made reference to supposed tunnels beneath the houses, calling sewer grates "entrance points" and adding that, "If I were them, I'd be watching this, [watching] my every move." *Id*. at 5:40–6:20; *see also id.* at 9:00–10.

FBI Special Agent Gastaldo, the lead investigator on Taranto's case, watched Taranto's livestream as he made it. ECF No. 36 at 30:13–16 ("[Special Agent Gastaldo] told me that on June 29th, he observed Mr. Taranto go live on Instagram and begin broadcasting live."). U.S. Secret Service officers stationed in Kalorama, alarmed by what they believed to be Taranto's suspicious behavior, separately began to monitor his movements. ECF No. 32 at 3. Taranto noticed those officers and walked into a wooded area by Rock Creek Parkway. When a Secret Service officer approached Taranto, he began to flee and dropped a bag (which was later retrieved). *See* ECF No. 36 at 36:16–21. Secret Service officers ultimately apprehended Taranto and placed him under arrest.

Just before Taranto began this second livestream, FBI Special Agent Joshua Rothman received an alert for a bomb threat in the Kalorama neighborhood, ECF No. 36 at 11:14–21, and was instructed by his superior, Special Agent Aiden Garcia, to respond. *Id*. at 27:18–24. Rothman arrived at the U.S. Secret Service Command Post in Kalorama, where he was told about the bag

that Taranto had dropped in the woods and remarks Taranto had made about his van (including about a detonator). *See* ECF No. 36 at 37:20–38:1. Several law enforcement agents were on the scene, including officers of the FBI, the Metropolitan Police Department, and the U.S. Secret Service.

Various law enforcement officers created a protective perimeter around Taranto's van to minimize the risk of harm to outsiders. ECF No. 36 at 62:12–19. Those officers wearing body-worn cameras disabled them to minimize the possibility that they might activate an explosive (such as through their Bluetooth connections). ECF No. 32 at 4. Two FBI bomb technicians—Special Agent Rothman and Special Agent Lynn Epley—were present. *See* ECF No. 36 at 79:15–19. Special Agent Rothman testified that during this period, their "sole purpose . . . was to render that vehicle safe [from] any threats or hazards and not to collect evidence of the crime." *Id*. at 68:6–8.

Two MPD K9 handlers also responded. MPD Officer William Washington, Jr. and K9 Harley, a bomb-sniffing dog trained to detect explosives, were assigned that day to the Explosive Ordnance Disposal unit. *See* ECF No. 32 at 4. Officer Washington led K9 Harley around Taranto's van once. *Id*. K9 Harley did not alert to the presence of explosives. *Id*.

A second MPD K9 handler, Officer David Boarman, was also present with K9 Trek. ECF No. 32 at 4. K9 Trek is trained to detect the scent of smokeless gunpowder. *See* ECF No. 36 at 122:15–21. Smokeless gunpowder is commonly found in firearms ammunition but can also be used in minor explosives such as "spring guns or bullets," booby trapped shotgun shells, and "pipe bombs . . . using gunpowder or flash powder." *See id*. at 41:14–25.

Officer Boarman and K9 Trek made two laps around Taranto's van. During the first lap, K9 Trek did not alert. Officer Boardman then took K9 Trek on a second lap around the van because he was concerned that the dog had not properly sniffed the "seams" of the vehicle "where the doors

open." *Id*. at 138:16–20.  During the second lap, K9 Trek alerted at least twice.  Officer Boarman believed these alerts signaled that K9 Trek had detected smokeless gunpowder in the van.  *See* ECF No. 36 at 117:18–118:3.

Special Agents Rothman and Epley, assisted by other officers, then conducted a protective sweep of the van.  Using a flashlight, Special Agent Rothman looked through the windows to see if there were any immediately apparent hazards inside.  *Id*. at 44:21–45:5.  Officers then opened the side doors using keys discovered on Taranto's person when he was arrested earlier.  *See* ECF No. 36 at 44:16–18.  Special Agent Rothman decided to enter Taranto's van through the side doors to avoid a "booby trap."  *Id*. at 45:11–15.

The interior of the van was "moderately disorganized."  *See* ECF No. 36 at 46:6–7. Officers found indications that Taranto had been living in the van, including a mattress, clothing, and personal items.  *See* Gov't Ex. 4B.  As the officers removed the effects, they discovered a backpack by "the driver's side toward the left of . . . the mattress" that was secured with a "type of TSA-style padlock on the zippers."  *Id*. at 46:20–25.  Officers also looked in the driver and passenger seats and underneath the mattress but did not find anything that specifically drew their attention.  *Id*. at 47:1–4.

Special Agent Rothman investigated the backpack to make sure it was not a "threat to anyone."  ECF No. 36 at 47:20.  He did not open the backpack using its zippers in case there was a "booby trap . . . that would cause something to go off," but instead cut the pack open.  *Id*. at 48:3–11.  Looking "into the backpack and along the seams of the zipper" to ensure it did not have explosives or a trap, *id*, Special Agent Rothman discovered two firearms, multiple magazines, and ammunition.  *See* ECF No. 34 at 4.

The next day, officers executed a search warrant on Taranto's vehicle and found a machete and steering wheel lock.

## II.        Procedural Background

About two weeks later, Taranto was indicted on four federal charges relating to his conduct at the U.S. Capitol on January 6, 2021, and two D.C. charges for his possession of firearms in Kalorama—carrying a pistol without a license, D.C. Code § 22-4504(a)(1), and possession of a large capacity ammunition feeding device, D.C. Code § 7-2506.01(b).  On February 15, 2024, a superseding indictment was filed that added one charge relating to his alleged conduct on January 6, 2021 (for obstructing an official proceeding under 18 U.S.C. § 1512(c)(2)) and three new charges relating to his alleged conduct in June 2023:  possession of an unregistered firearm, 26 U.S.C. §§ 5861(d), 5845(a)(3), unlawful possession of ammunition, D.C. Code § 7-2506.01(a)(3), and conveying a hoax in his June 28 livestream, 18 U.S.C. § 1038(a)(1).

On September 27, 2023, Taranto moved to suppress the guns and ammunition found in his van.  *See* ECF No. 30.  He argued that all three dog sniffs were searches and that the government was required to have a warrant for those searches, as well as for the searches of the van and backpack.   The government opposed, arguing primarily that each of its steps, up through and including the search of the backpack, was supported by probable cause and the exigent circumstances of a possible explosive device.

On October 24, 2023, the Court held a suppression hearing, at which Special Agent Rothman and Officer Boarman testified.  The parties submitted post-hearing briefs.  Trial is scheduled to begin on July 8, 2024.

## III.        Analysis

The Fourth Amendment of the U.S. Constitution provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures

shall not be violated." U.S. CONST. AMEND. IV.  When, as here, the government conducts a search absent a warrant, the search must satisfy one of the exceptions to the warrant requirement.  One such exception is for exigent circumstances.  As the Court of Appeals has put it, "[e]xigency can justify a warrantless search 'when there is compelling need for official action and no time to secure a warrant.'"  *Corrigan v. District of Columbia*, 841 F.3d 1022, 1030 (D.C. Cir. 2016) (quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)).  "Such exigencies include the need to pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence."  *Carpenter v. United States*, 585 U.S at 319-20 (citations omitted).  This is especially the case when law enforcement believes a defendant is hiding particularly dangerous materials that are potentially unstable and could therefore injure others, such as explosives.  *See, e.g.*, *United States v. Haldorson*, 941 F.3d 284, 294 (7th Cir. 2019).[2] When relying on exigent circumstances to proceed without a warrant, the officers must have "at least probable cause to believe that one or more of the . . . factors justifying entry were present." *Corrigan*, 841 F.3d at 1030 (quoting *Minnesota v. Olson*, 495 U.S. 91, 100 (1990)).

Another exception relates to vehicles.  The Supreme Court has long recognized a diminished expectation of privacy in vehicles.  *See Carroll v. United States*, 267 U.S. 132, 153 (1925) (holding that "contraband goods concealed and illegally transported in an automobile or other vehicle may be searched for without a warrant" provided there is probable cause to conduct the search).  As a result, officers may conduct a warrantless search of a vehicle so long as they have probable cause to believe it contains evidence of a crime.  *See Wyoming v. Houghton*, 526

---

[2] Not every search that violates the Fourth Amendment is subject to the exclusionary rule.  *See Herring v. United States*, 555 U.S. 135, 140 (2009).  Here, however, the government does not argue that the evidence should not be excluded even if was located as the result of an unconstitutional search or searches.

U.S. 295, 307 (1999) (holding that "police officers with probable cause to search a car may inspect passengers' belongings found in the car that are capable of concealing the object of the search"). However, officers relying on the vehicle exception may only search those parts of the vehicle that they have probable cause to believe contain evidence of a crime. *See United States v. Jackson*, 415 F.3d 88, 91 (D.C. Cir. 2005).

For purposes of the suppression motion, the Court assesses evidence based on the totality of the circumstances, with a focus on what law enforcement officers knew at the time they took a particular action. *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). This standard does not require each officer to individually know all relevant facts sufficient to establish probable cause. *See United States v. Hensley*, 469 U.S. 221, 232-33 (1985). Rather, officers can reasonably rely on facts known by other officers who direct them or seek their help, even when "they [are] unaware of the specific facts that established probable cause." *Id*. at 230-31; *see also United States v. Gorham*, 317 F.Supp.3d 459, 470 (D.D.C. 2018). When resolving a motion to suppress evidence before trial, the Court may consider hearsay evidence, weighing its trustworthiness and reliability. *U.S. v. Raddatz*, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though the evidence would not be admissible at trial.").

For purposes of this opinion, the Court finds the testimony of Special Agent Joshua Rothman and Officer David Boarman credible. The Court also finds, based on the evidence presented at the hearing, that K9 Officers Harley and Trek have been properly trained and can reliably smell explosives and smokeless gunpowder, respectively.

## A.  Dog Sniffs

A Fourth Amendment search occurs when the government obtains information by intruding upon an expectation of privacy that "society is prepared to recognize as reasonable." *Smith v.*

*Maryland*, 442 U.S. 735, 740 (1979) (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).  Taranto argues that each of the three laps with a K9 around his van was a search.  *See* ECF No. 34 at 5-8.  The government demurs, relying on *Illinois v. Caballes* for the proposition that a dog sniff of a suspect's car for narcotics during an arrest does not constitute a search.  *See* ECF No. 32 at 8-9 (discussing 543 U.S. 405 (2005)).

The Court need not reach the question of which, if any, of these steps constituted a search because each was supported by probable cause and each occurred when there were exigent circumstances based on the threat of explosives in the van.  As the Supreme Court has recognized, courts have "approved warrantless searches related to bomb threats."  *Carpenter*, 585 U.S. at 320. Indeed, "[e]xigent circumstances are frequently found when dangerous explosives are involved." *Armijo v. Peterson*, 601 F.3d 1065, 1071 (10th Cir. 2010); *see also United States v. Haldorson*, 941 F.3d 284, 295 (7th Cir. 2019) ("The exigent circumstances exception is frequently invoked in cases involving explosives.").  Moreover, officers had probable cause to believe that Taranto's vehicle had evidence of a crime—namely, an illegal explosive that could injure property and innocent bystanders.  *See, e.g.*, *Savage-El v. United States*, 902 A.2d 12 (D.C. 2006) (holding that "an explosion or conflagration that plainly could have resulted" in death or serious bodily injury constitutes a "dangerous weapon" as prohibited by D.C. Code § 22-4504(a)(1)).

Start with Officer Washington's actions with K9 Harley.  At that time, and as reflected above, officers from the MPD, the U.S. Capitol Police, the FBI, and the Secret Service collectively knew that a BOLO alert issued on June 28 identified Taranto as potentially "armed and dangerous" based on disturbing comments he had made on a livestream about a "detonator" in his van.  *See* Gov't Ex. 1 at 1.  They knew that Taranto had driven that same van to Kalorama the next day. They knew that he had engaged in suspicious behavior, fled Secret Service when approached, and

had dropped a suspicious bag as he tried to escape.  *See* ECF No. 36 at 36:16–21.  All this was enough to give law enforcement probable cause that Taranton's vehicle contained illegal explosives or a detonator, and thus to at least use well-trained dogs to sniff the exterior of the van to attempt to discern whether that was the case.  *See United States v. Holder*, 990 F.2d 1327, 1328 (D.C. Cir. 1993) ("Probable cause exists if a reasonable and prudent police officer would conclude from the totality of the circumstances that a crime has been or is being committed.").

The exigencies of the situation also justified a warrantless search.  Taranto's suspicious statements and behavior raised a real possibility that he intended to detonate a bomb with his vehicle in a "residential neighborhood."  *See United States v. Lindsey*, 877 F.2d 777, 781 (9th Cir. 1989); ECF No. 36 at 61:14–18 ("[T]he level of threat was unknown at that time, which means there was an elevated level of concern based on the statements made.").  This is the case even though by then Taranto lacked access to the van and its contents.  After all, Taranto had stated that he did "not need to be anywhere near it when it goes off."  Gov't Ex. 2 at 4:30.  And in any event, the officers could have reasonably concluded that "homemade pipe bombs, and other improvised explosive devices, are unstable."  *Haldorson*, 941 F.3d at 296.  The officers thus "reasonably believed that there was a justifiable and urgent need to act."  *Id.* at 295.  "A further delay to obtain a warrant would have been intolerable."  *Lindsey*, 877 F.2d at 782.

What about Officer Boarman's first lap with K9 Trek?  To be sure, at that point, officers had one additional piece of information—that K9 Harley had not alerted to the presence of explosives in the vehicle.  But as Special Agent Rothman testified at the suppression hearing, there was a lingering threat of "spring guns or bullets," "shotgun shells that [we]re booby trapped," "pipe bombs . . . using gunpowder or flash powder" that could still pose a safety threat to the community.  *See* ECF No. 36 at 41:14–25.  It was reasonable for officers to conclude that even if

a bomb-sniffing dog did not alert to Taranto's van, a dog trained to detect gunpowder could nonetheless detect smaller and more targeted explosives. *Id*. at 41:23–42:1 ("[A]lthough the initial concern was not as high as a large quantity of explosives, we still had a level of concern[] as to the safety of ourselves and others around us."). Given Taranto's disturbing comments, his suspicious behavior, and his flight from Secret Service when approached, it was reasonable for law enforcement to engage his vehicle with a gun-sniffing dog trained to detect explosive gunpowder, even if law enforcement did not receive an alert from the first bomb-sniffing dog K9 Harley. The first lap with K9 Trek, just like the lap with K9 Harley, was justified by both the exigencies of the situation and probable cause to believe that Taranto's van contained illegal explosives.

And the second lap with Trek? Again, officers had one additional piece of information— that Trek had not alerted, during his first lap, to the presence of gunpowder. But as Officer Boarman explained, on the first lap around Taranto's van, K9 Trek had not "detailed[ed] the seams." ECF No. 36 at 138:16–17. Officer Boarman was concerned that K9 Trek had not "put[] his nose on the seams and sniff[ed] where the doors open." *Id*. at 138:19–20. More important, based on all of the facts known to officers at this point, the government continued to have probable cause that the vehicle contained evidence of a crime and that the situation remained exigent

### B. Van and Backpack

Officers did not stop there, of course—they entered the van and searched Taranto's backpack. As discussed above, even before the dog sniffs, law enforcement officers were justified in acting without a warrant both because they had probable cause to believe that Taranto's van contained illegal explosives and that exigent circumstances existed. Following the sniffs, officers had two primary additional pieces of information—K9 Harley had not alerted to the possibility of explosives, but K9 Trek had alerted to the possibility of smokeless gunpowder. In the Court's view, all of the information then-available to the officers (that is, at the time they entered the van)

was sufficient to establish that the exigency still existed.  After all, Taranto had made a number of disturbing comments and had taken a number of erratic actions.  There was also a possibility that Taranto could still "initiate the detonation of a bomb remotely while in police custody" with a timer, *see* ECF No. 36 at 57:1–6, or that the explosives were so "unstable" that they could detonate on their own. *Haldorson*, 941 F.3d at 296.  K9 Trek's alert to the potential presence of gunpowder in the van made the searches all the more justified in response to the ongoing exigency of a dangerous explosion.

As for probable cause, while it is the case that firearms possession can be lawful (and thus the officers may not have had probable cause to search the van for a gun), the evidence at the hearing established that smokeless gunpowder can be present in explosive devices.  As a result, following the three dog sniffs, the officers still had probable cause to believe that Taranto's van had evidence of a crime:  illegal and dangerous explosives.  *See* ECF No. 36 at 58:20–22 ("Homemade detonators can also be constructed with anything from gunpowder, at low levels, to other chemicals or explosives.").

Once inside the van, it was certainly reasonable for officers to search any containers that may have contained the potential explosives.  *See Houghton*, 526 U.S. at 307 ("[P]olice officers with probable cause to search a car may inspect passengers' belongings found in the car that are capable of concealing the object of the search.").  This included Taranto's backpack, which was located right behind the driver's seat—where K9 Trek first alerted law enforcement to the presence of gunpowder.  In addition, the bag, with its black camouflage and padlock, was immediately suspicious.  An officer like Special Agent Rothman, who is trained in explosives, could reasonably suspect that the bag contained explosives or other dangerous materials.  *See* ECF No. 36 at 47:16–20 ("Based on the fact there was a possibility of detonators or other devices that could cause a

hazard, before we could feel comfortable turning over any vehicle or anything to an investigative team . . . we had to ensure there was no threat to anyone."). Opening the backpack was thus justified by the exigencies of the situation and probable cause.[3]

### IV. Conclusion

Taranto's Motion to Suppress, ECF No. 30, is **DENIED**.

DATE:  March 6, 2024

_____

CARL J. NICHOLS
United States District Judge

---

[3] Taranto also challenges the June 30 search warrant, but that challenge is largely dependent on his arguments about the searches the day before. To the extent he presses other arguments regarding the warrant, the Court concludes they lack merit.