# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 23-cr-229 (CJN)** |
| | : | |
| **TAYLOR FRANKLIN TARANTO,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Taylor Franklin Taranto to a total of 27 months of incarceration, 36 months of supervised release, 200 hours of community service, and the mandatory assessment of $100 for each felony count. The government's recommended term of incarceration is at the top of the applicable 21- to 27-month guidelines range calculated by the United States.

## I.    INTRODUCTION

The defendant, Taylor Franklin Taranto, perpetrated a hoax on June 28, 2023, by falsely claiming that he would cause a car bomb to drive into the National Institute of Standards and Technology. The next day, he drove to a residential neighborhood in Washington, D.C., causing a substantial disruption to the residents and regional law enforcement. When the police responded to the scene of a potential car bomb—near a restricted area that was protected heavily by the United States Secret Service—Taranto tried to flee and left his van behind. After securing Taranto's van and executing a lawful search of the vehicle, police found a CZ Scorpion, an M&P pistol, and hundreds of rounds of ammunition in his backpack, which he left in the van. Taranto unlawfully carried the pistols and unlawfully possessed the ammunition.

Taranto's actions caused the evacuation of a residential neighborhood and forced law enforcement agents from multiple agencies to respond to his false bomb hoax. The government recommends that the Court sentence Taranto to 27 months of incarceration total for the offenses he committed. A 27-month sentence reflects the gravity of Taranto's conduct, his lack of remorse, and the need to deter him and others from engaging in similar threatening conduct.

## II.    FACTUAL BACKGROUND

On January 6, 2021, thousands of people comprising a mob of rioters attacked the U.S. Capitol while a joint session of Congress met to certify the results of the 2020 presidential election. Taranto was accused of participating in the riot in Washington, D.C., by entering the U.S. Capitol Building. After the riot, Taranto returned to his home in the State of Washington, where he promoted conspiracy theories about the events of January 6, 2021.

In June 2023, Taranto returned to Washington, D.C. He drove through the city and the surrounding region in his van and engaged in alarming behavior that targeted public officials. His erratic behavior intensified on June 28, 2023, when he livestreamed himself and suggested that he had outfitted his vehicle with a detonator. He made several statements indicating that he intended to blow up his vehicle at the National Institute of Standards and Technology ("NIST"). He stated that he was headed to NIST and that his van was "self-driving." He stated that he was "just going one way for this mission, to hell." He remarked that the vehicle was capable of "driv[ing] by itself" and that he would "not need to be anywhere near it when it goes off." Taranto said he had "been working on a detonator, but [he didn't] really need one for this." U.S. Capitol Police obtained a copy of this footage and issued a "be-on-the-lookout" alert to several law enforcement agencies, informing them of Taranto's van and his comments about a "detonator."

The next day, on June 29, 2023, then-former President Donald Trump published on a social media platform the purported address of former President Barack Obama. Taranto re-posted the address on the same platform and thereafter started livestreaming from his van on his YouTube channel. Taranto broadcast footage of himself as he drove through the Kalorama neighborhood in Washington, D.C., claiming he was searching for "tunnels" he believed would provide him access to the private residences of certain high-profile individuals, including former President Obama. He parked his van, walked away from it, and approached a restricted area protected by the United States Secret Service. He walked through the nearby woods and stated, "Gotta get the shot, stop at nothing to get the shot." After noticing the presence of the Secret Service he said, "If I were them, I'd be watching this, watching my every move." He also said, "So yeah, more than likely, these guys also all hang for treason" and "I control the block, we've got 'em surrounded." When Secret Service agents approached him, Taranto fled, but he was apprehended and placed under arrest.

Shortly following his arrest, officers located Taranto's van and multiple law enforcement agencies responded to the scene. Mindful of the possible existence of an explosive device or detonator, members of the Metropolitan Police Department and FBI Special Agent Bomb Technicians conducted a safety sweep of the van for hazardous or dangerous materials. A lawful search was then conducted of Taranto's van, which was parked near the scene of his arrest in Kalorama. Two firearms were seized from the backpack he left in the van, the CZ Scorpion (serial number C193454) and the M&P pistol (serial number LFK6710). The CZ Scorpion had an accessory attached to its frame, marketed by SB Tactical as a "stabilizing brace." Police also recovered hundreds of rounds of ammunition.



*Firearms (circled) displayed in Taranto's van.*

### III.    THE CHARGES

On February 14, 2024, Taranto was charged by Superseding Indictment with the following offenses: (1) Possession of an Unregistered Firearm, in violation of 26 U.S.C. §§ 5861(d) and 5845(a)(3) (Count One); (2) Carrying a Pistol Without a License (Outside Home or Place of Business), in violation of 22 D.C. Code § 4504(a)(1) (Count Two); (3) Carrying a Pistol Without a License (Outside Home or Place of Business), in violation of 22 D.C. Code § 4504(a)(1) (Count Three); (4) Possession of a Large Capacity Ammunition Feeding Device, in violation of 7 D.C. Code § 2506.01(b) (Count Four); (5) Unlawful Possession of Ammunition, in violation of 7 D.C. Code § 2506.01(a)(3) (Count Five); (6) False Information and Hoaxes, in violation of 18 U.S.C. §1038(a) (Count Six); (7) Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) and 2 (Count Seven); (8) Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Eight); (9) Disorderly or Disruptive Conduct in a

Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Nine); (10) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Ten); and (11) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Eleven). Several counts were subsequently dismissed pursuant to motions filed by the government.

The bench trial in this case started on May 13, 2025, and concluded on May 20, 2025. On May 20, 2025, the Court rendered its findings and found defendant guilty of the remaining counts: two counts of Carrying a Pistol Without a License ("CPWL"), in violation of 22 D.C. Code § 4504(a)(1) (Counts Two and Three); one count of Unlawful Possession of Ammunition, in violation of 7 D.C. Code § 2506.01(a)(3) (Count Five); and one count of False Information and Hoaxes, in violation of 18 U.S.C. §1038(a) (Count Six).

## IV.    STATUTORY PENALTIES

Taranto now faces sentencing for these four offenses. As noted by the Presentence Report issued by the U.S. Probation Office, the defendant faces the following penalties.

- For each count of CPWL (Counts Two and Three): Up to 5 years' imprisonment, not more than 3 years' supervised release, and a maximum statutory fine of $12,500.

- For Unlawful Possession of Ammunition (Count Five): A 1-year maximum term of imprisonment, and a maximum statutory fine of $2,500.

- For Hoaxes (Count Six): Up to 5 years' imprisonment (Class D Felony), a term of supervised release of not more than three years, and a fine up to $250,000.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 42. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, at 16, Taranto's Guidelines imprisonment range is 21 to 27 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration at the top of the sentencing guidelines range, with credit for time served, followed by three years of supervised release and 200 hours of community service.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Taranto's felonious conduct prompted a large-scale law enforcement response to the potential threat of a car bomb, and his actions caused a substantial disruption in a residential neighborhood that was protected by the Secret Service. His bomb hoax followed actions and statements designed to intimidate and harass current and former elected officials. His possession of two guns and hundreds of rounds of ammunition should be viewed with the backdrop of political violence in mind, at a time when acts of violence perpetrated for political reasons are justifiably generating substantial public concern.[1] Moreover, Taranto broadcast his criminal behavior indiscriminately through social media to promote fear and violence.

---

[1] The government notes that, as laid out in the PSR, an upward departure may apply in this case under U.S.S.G. § 3A1.4, if the Court finds that the instant offense was calculated to influence or affect the conduct of government by intimidation or coercion, or retaliate against government conduct. PSR ¶ 133. While the government is not arguing for an upward departure, the possible application of § 3A1.4 speaks to the serious nature of Taranto's offenses.

Taranto's private messages reflect his violent intent around the time of his offenses:

*Telegram Messages from April 23, 2023*

- "We have to kill everyone who got in my way." Gov. Ex. 207C.

- "I need you to seek vengeance against them." Gov. Ex. 207D.

- "You have to kill or be killed." Gov. Ex. 207E.

- Responding to a message from "irmi" in which she writes, "Spread love to all," Taranto responded, "Right love bullets." Gov. Ex. 207G.

*Telegram Messages from May 7, 2023*

- Discussing former Vice President Kamala Harris, "We can kill her through [REDACTED]" Gov. Ex. 207I.

- From an exchange with "irmi." Gov. Ex. 207J.

  - Taranto: "This is the biggest contract I have ever satisfied..."[2]

  - Irmi: "Contract... are you OK?"

  - Taranto: "We have to kill them all..."

- From the same exchange. Gov. Ex. 207K.

  - Irmi: "You can't ....too many"

  - Taranto: "Payout is in the hundreds of millions"

  - Taranto: "I have to...or atleast die trying..."

*Telegram Messages from May 13, 2023*

- "We have to kill them all." Gov. Ex. 207L.

- "I'm going incognito []...." and "Right ..we still have to kill them all." Gov. Ex. 207M.

- "I'm wearing my 45...I need to get in...they can't stop me." Gov. Ex. 207N.

---

[2] The ellipses are in the original messages and do not indicate omissions.

*Excerpt from Undated Livestream.* Gov. Ex. 511:

- Explaining why he visited a Maryland elementary school on June 18, 2023:

  > The reason probably we were picking that location was because its, you know, [U.S. Congressman Jamie] Raskin, Raskin, he lives over there and he's one of the guys that hates January 6 people or more like Trump supporters and it's kinda like sending a shockwave through him because I did nothing wrong. And he's probably freaking out, and saying sh*t like, "Well, he's stalking me!" Like AP there. Even though I didn't go to his house or anything. I didn't tell anyone where he is. Because I want him all to myself.

Taranto's menacing rhetoric harms public discourse and encourages others to use threats and violence to advance their views or silence their perceived political opponents. Accordingly, a substantial term of incarceration is necessary to "reflect the seriousness of the offense," "promote respect for the law," and "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

### B. The History and Characteristics of the Defendant

Taranto is a 39-year-old man from Pasco, Washington. He reports that he is a veteran who was enlisted in the Navy from 2004 to 2010. PSR ¶ 81. He has been unemployed since 2013, and claims to be 100% disabled for post-traumatic stress disorder related to his military service. PSR ¶¶ 65, 79. Taranto's employment with the U.S. military and service-connected disability rating have not been verified. PSR ¶ 81. He is married and has two children. PSR ¶ 52. When the U.S. Probation Office for the Eastern District of Washington visited his home on August 11, 2025, they found a gun safe in Taranto's home containing an unknown number of firearms. PSR ¶ 55. Taranto's wife claimed that she is the only person who knows the combination to the safe and that Taranto does not have access to it. PSR ¶ 55.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Taranto falsely stated that he would drive a car bomb into a federal facility that houses a neutron reactor. He possessed two firearms and hundreds of rounds of bullets the day after propagating that hoax. His actions caused serious concerns about the danger he posed to the public. Moreover, Taranto's actions were part of a broader campaign of intimidation against the federal government and public officials. Such threats epitomize disrespect for the law.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving terroristic threats and bomb hoaxes. The demands of general deterrence weigh strongly in favor of incarceration to prevent others from recklessly spreading terroristic messages over the internet.

### Specific Deterrence

The need for the sentence to provide specific deterrence to this defendant also weighs heavily in favor of a lengthy term of incarceration. Taranto has not expressed remorse for his actions or even acknowledged that his conduct was criminal and wrongful. As the Court was able to witness firsthand during trial, Taranto was visibly laughing while viewing some of the alarming rhetoric he used during livestreams on June 28 and 29, 2023. Moreover, as of August 11, 2025, Taranto still had firearms in his home.

**E.      The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

## F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means

that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013). "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up). While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Although no other case contains the same balance of aggravating and mitigating factors present here, the sentences of other defendants convicted under 18 U.S.C. § 1038(a) are potentially instructive in weighing Taranto's conduct and characteristics. In *United States v. Tommy J. Hollis*, No. 21-cr-33 (N.D. Tex.), Defendant Hollis pleaded guilty to one count of 18 U.S.C. § 1038(a)(1) pursuant to a plea agreement. Hollis was sentenced to 24 months' incarceration for submitting a threat through the FBI's tip portal. Hollis stated, "I'm planning on bombing the downtown Wichita Falls Texas on September 11th, 2021." He used the initials D.H. to make the threat because he wanted law enforcement to arrest a former friend with those initials. There is no indication from the record that the threat caused any disruption to the downtown area of Wichita Falls, Texas. By

contrast, Taranto's threat caused a substantial disruption, the threat was indiscriminately broadcast to the public (not just law enforcement), and he was motivated by his grievances against the government.

In *United States v. Gabriel Frith*, Defendant Frith entered a plea of guilty to a single count under 18 U.S.C. § 1038(a) for calling in a false bomb threat at a Hyatt hotel where he worked as a security guard and was sentenced, like Taranto, at an offense level of 16 and criminal history category I. *Frith*, No. 25-5219, 2025 LX 473032, at *4–5 (6th Cir. Oct. 8, 2025). Citing to Frith's youth,[3] mental-health issues, and minimal criminal history, the court varied downward, sentencing Frith to 12 months' imprisonment and three years of supervised release. *Id*. at 4. However, Frith's downward departure is easily distinguishable from Taranto's conduct, given the substantial differences in age (Taranto is approximately two decades older than Frith) and the targets of their respective conduct (for Frith, the private hotel that employed him, versus the federal buildings and employees of NIST in the case of Taranto). Frith's sentencing also directly incorporated his acceptance of responsibility via entry of a plea (which reduced his offense level from 19 to 16, essentially countering the three-level multiple-count adjustment under U.S.S.G. § 3D1.4). *Frith*, 2025 LX 473032, at *4. Taranto has not accepted the wrongfulness of his actions at any stage of this case. Finally, Frith's bomb threats, while unquestionably disruptive to public safety services, were not related to broader political discourse and did not involve any troubling statements relating to public figures. Taranto's actions targeted a federal building, federal workers, and public officials. As a result, any disparity between Frith's sentence and the 27-month sentence sought by

---

[3] Per public reporting, Frith was 19 at the time he was indicted in his case. Bill Estep, *Kentucky security guard allegedly reported false bomb threats at places he worked*, LEXINGTON HERALD LEADER (May 3, 2024), https://www.kentucky.com/news/local/counties/fayette-county/article288272915.html.

the government for Taranto reflects an appropriate relationship between the sentences for two relatively disparate defendants.

## VII.    FINE

Taranto's convictions subject him to certain statutory fines. PSR ¶¶ 123–31. In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). While the PSR concludes that Taranto is not likely to be able to pay a fine, the government notes that no supporting documentation was provided to Probation. *See* PSR ¶¶ 93–94.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that, for Count Six (Hoaxes), the Court impose a sentence of 27 months' incarceration, 36 months of supervised release, 200 hours of community service, and the mandatory assessment of $100. For Counts Two and Three (CPWL), the government recommends that the Court impose a sentence of 24 months of incarceration, 36 months of supervised release, and the mandatory assessment of $100 for each count. For Count Four (Unlawful Possession of Ammunition), the government recommends that the Court impose a sentence of 12 months of incarceration. The sentences should be concurrent to one another.

Respectfully submitted,

Jeanine Ferris Pirro
UNITED STATES ATTORNEY

By: 

CARLOS A. VALDIVIA
DC Bar No. 1019242
SAMUEL WHITE

NC Bar No. 44908
Assistant United States Attorneys
601 D Street, NW
Washington, D.C. 20530
(202) 252-7508
Carlos.Valdivia@usdoj.gov